IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

KRISTINE M. DISHONG,

　　　　　　　Plaintiff,

vs.

NANCY A. BERRYHILL,[1] Acting
Commissioner of the Social Security
Administration,

　　　　　　　Defendant.

8:15-CV-399

MEMORANDUM AND ORDER

This matter is before the Court on the denial, initially and upon reconsideration, of plaintiff Kristine M. Dishong's application for disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. § 401 *et seq*., and supplemental social security income benefits under Title XVI of the Act, 42 U.S.C. § 1381 *et seq*.  The Court has considered the parties' filings and the administrative record, and reverses the Commissioner's decision to deny benefits. The Court will remand this case to the Commissioner for calculation and award of benefits.

## PROCEDURAL HISTORY

Dishong applied for disability insurance benefits in May 2012, alleging disability beginning on November 24, 2011. T172-179. Dishong's claims were denied initially and on reconsideration. T78-79, 81-82. Following a hearing, the administrative law judge (ALJ) found that Dishong was not disabled as defined under 42 U.S.C. §§ 416(i) or 423(d), and therefore not entitled to

---

[1] Nancy A. Berryhill is now the Acting Commissioner of Social Security and will be automatically substituted as a party pursuant to Fed. R. Civ. P. 25(d).

disability benefits. T11-28. The ALJ determined that although Dishong suffered from severe impairments, she was capable of performing her past relevant work and had the residual functional capacity to perform other jobs that exist in significant numbers in the national economy. T14, 26-28. The Appeals Council denied Dishong's request for review of the decision. T1-3. Dishong's complaint seeks review of the ALJ's decision as the final decision of the Commissioner under sentence four of 42 U.S.C. § 405(g). Filing 1.

## FACTUAL BACKGROUND

The record contains extensive evidence of Dishong's years of psychiatric treatment, which the Court has thoroughly reviewed. To summarize, Dishong has suffered a course of bipolar I disorder: a condition characterized by manic episodes of at least a week, and commonly punctuated by hypomanic episodes and major depressive episodes. *See* Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* 123-32 (5th ed. 2013) [hereinafter "DSM-5"]; *see also* Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* 350-58 (4th ed. 1994) [hereinafter "DSM-IV"]. Most people who have a single manic episode go on to have recurrent mood episodes, and most manic episodes occur before major depressive episodes. DSM-5 at 130. More than four episodes in a year is described as "rapid cycling"; women are particularly likely to experience rapid cycling, and co-occurring mental disorders are common. *Id.* at 130, 132.

### MEDICAL RECORDS

Dishong's primary treatment provider has been Mat Balcetis, M.S., NCC, LIMHP, who conducted an initial outpatient evaluation of Dishong in November 2005. T329-333. By August 2009, Dishong had been diagnosed by Susan Crane, APRN, with bipolar I disorder with mixed features. T517. On

several instances in 2009 and 2010, Crane opined that Dishong was temporarily totally disabled from working. T517, 509, 506.

Balcetis saw Dishong on a regular basis starting no later than 2011. (It is not clear to the Court how complete the medical records are with respect to the period before then.) The form on which Balcetis recorded his progress notes ask the treatment provider to check a box indicating the patient's "Progress Rating on Specific Identified Goal": for the most part, Balcetis checked "Improvement" on that line over the course of Dishong's treatment. *E.g.* T328. But occasionally he thought there was "No Change," and sometimes he thought Dishong had "Regressed." *E.g.* T428, 320.

Balcetis' progress notes indicate that through the spring of 2011, Balcetis thought Dishong had shown improvement toward her goals, which generally involved improving and stabilizing her mood. *E.g.* T322-326. Dishong even showed "Significant Improvement" in late May. T323. But Balcetis and Crane's notes both reflect that by August, Dishong had slipped into a manic episode and regressed. T316-321. At the end of August, Crane again opined that Dishong was temporarily disabled. T481. Crane reached the same conclusion in early September, although her notes also indicate that Dishong's mood was becoming more stable. T498, 315. Balcetis noted regression on September 8, but some stability after that, and even some improvement. T306-314. Dishong's medications were adjusted. T310, 312. By October and November, both Crane and Balcetis were noting stable progress. T301-307.

December 2011 showed regression, occasioned by elevated obsessive thinking and anxiety, and Dishong reported a "nervous breakdown." T298-300. Crane opined on December 13 that Dishong was again temporarily disabled. T478. Once Dishong was on short-term disability and relieved of the

demands of work, she relaxed some. T296. But she was still unstable, withdrawn, and anxious; and at the end of January 2012 Balcetis was still noting "rocky" progress toward her goals. T291-297. February and March showed some stable progress, but also regression. T284-290. She resigned from her job in March. T285. In April, Crane's evaluation found severe, persistent mental illness, and Dishong's prognosis was guarded. T278-281.

By May 2012, Balcetis thought Dishong was showing improvement. T273-276. Dishong's mood had stabilized and improved—largely, Balcetis thought, "because she is no longer working, this appears to help greatly with mood and irritability." T273. In June, Balcetis still thought Dishong was showing stable improvement, but again noted that "stressors are minimized [without a fulltime] job." T271.

On July 6, 2012, state agency consultant Glenda L. Cottam, Ph.D., J.D., completed a psychiatric review technique based on her review of Dishong's medical records to that point, in which she agreed that Dishong suffered from bipolar disorder, an anxiety disorder, and a possible personality disorder. T349, 351, 353. Cottam found Dishong to be mildly restricted in activities of daily living, and moderately affected by difficulties in maintaining social functioning and maintaining concentration, persistence, or pace. T356. Dr. Cottam also completed a mental residual functional capacity assessment. T341-344. Dr. Cottam opined that there were no significant limitations of Dishong's understanding and memory, and that Dishong's sustained concentration and persistence were not impaired except for moderate limitation in her ability to maintain attention and concentration for extended periods. T341. Dishong's social interaction was moderately limited with respect to her ability to interact appropriately with the general public, accept instructions and respond appropriately to criticism from supervisors, and get

along with coworkers or peers without distracting them or exhibiting behavioral extremes. T342. And Dishong was moderately limited in her ability to respond to changes in the work setting. T342. State agency consultant Lee Branham, Ph.D., completed a psychiatric review technique on September 10, 2012, based on his review of the medical records to that point, and agreed with Dr. Cottam's conclusions. T369.

Balcetis' progress notes reflect improvement through December 2012. T381-391. Dishong's treatment was transferred from Crane to Michael L. Egger, M.D., while she continued her regular therapy with Balcetis. T378-379. Dr. Egger's initial outpatient evaluation agreed with previous diagnoses of severe bipolar I disorder. T378; *see* DSM-5 at 126. Dr. Egger prescribed additional medication and encouraged Dishong to pursue her disability claim, opining that "[s]he really cannot sustain competitive employment[.]" T379.

Dishong continued to see Balcetis and Dr. Egger regularly throughout 2013. T388-463. Balcetis noted regression in late January, but generally thought Dishong was improving. T390-400. Nonetheless, Balcetis regularly noted Dishong's unstable mood and elevated irritability, and Dishong had some difficulty with her medications. T390-400. In May, Balcetis opined that Dishong's mood had "stabilized and improved[,]" but largely "because she is no longer working." T443. He noted some "difficult weeks" and the troublesome "side effects and fatigue" associated with her medication regimen. T443. And, Balcetis noted, "[m]ood instability and irritability can return with daily and family stresses." T443.

They had returned in force by June 2013, when Dishong regressed again into another manic episode. T420. She reported to Balcetis that she was more isolated, irritable, and depressed. T420. But she improved shortly thereafter, T419, and was stable by the end of June, T417. In July, she was

still struggling with the side effects of her medication, particularly fatigue. T416. By late July and into August, Balcetis was again noting regression. T412-414. Dishong stabilized in mid-August, and Balcetis again opined that her mood had stabilized and improved because she was no longer working. T411. Dr. Egger noted depression in mid-August, T410, and Balcetis noted fair to stable progress shortly thereafter, T430.

Dishong was stable in September 2013, and began to show some improvement. T427-429. But stable improvement at the beginning of October, T426, gave way to regression in mid-October and early November, T424-425. Dishong was feeling better and more relaxed, however, by the end of November into December. T423, 462.

On January 17, 2014, Balcetis completed a mental residual functional capacity assessment, reiterating the conclusion that Dishong suffered from severe bipolar I disorder. T447-452. He opined that Dishong's prognosis was poor, because her "mental health status (to include ability to function at job & w/family) deteriorates when under stress of daily work." T447. Balcetis described the side effects of Dishong's medications as "extreme fatigue requiring long naps." T448. He said that her mood swings and irritability were "very consistent" and tended "to worsen with normal daily living stressors." T448. Balcetis opined that Dishong would be precluded from performing for at least 15 percent of an 8-hour work day in nearly every category of understanding and memory, and sustained concentration and memory; and for 10 percent of an 8-hour work day in nearly every category of social interaction. T449-450. She would be unable to perform for 15 percent of a work day due to her limited ability to respond appropriately to changes in the work setting. T450. Balcetis explained that Dishong "becomes increasingly irritable/angry/anxious" in response to demands placed on the

abilities assessed. T451. Balcetis concluded that when Dishong's limitations were considered in combination, she would be unable to perform a job for more than 30 percent of an 8-hour work day, 5 days per week; and that she would be likely to miss 4 days of work per week as a result of her impairments. T451.

Dr. Egger completed a mental residual functional capacity statement on January 30, 2014. T454-459. He also reiterated the diagnosis of severe bipolar I disorder. T454; *see* DSM-IV at 351-52. Dr. Egger opined that Dishong was able to live independently, but not able to be competitively employed. T454. He characterized the side effects of Dishong's medications as "moderate lethargy." T455. Dr. Egger also opined that Dishong would be precluded from performing for at least 10 percent and usually 15 percent of an 8-hour work day in nearly every category of understanding and memory, and sustained concentration and memory; and for 5 to 15 percent of an 8-hour work day in every category of social interaction. T456-457. Dr. Egger found Dishong would be unable to perform for 10 percent of a work day due to limitation on her ability to respond appropriately to changes in the work setting, and for 15 percent of a work day due to limitation on her ability to set realistic goals or make plans independently of others. T457. He explained that she had a "very limited ability to set[,] shift and refocus on new data or direction." T458. He concluded that when Dishong's limitations were considered in combination, she would be unable to perform a job for more than 30 percent of an 8-hour work day, 5 days per week; and she would be likely to miss 5 or more days of work per week as a result of her impairments. T458. He explained that she "cannot sustain attention, concentration or pace for competitive employment in [the] foreseeable future." T459.

On April 3, 2014, Dishong was seen by Frederick Petrides, Ph.D., for a consultative examination, and he authored a psychological report. T487. He does not seem to have reviewed her medical records. Based on his interview of Dishong, he concluded that she suffered from an "unspecified anxiety disorder" and "unspecified depressive disorder, mild." T490. He opined that Dishong "relies on her psychiatric treatment as opposed to attempting to pursue gainful employment." T490. He completed a form on which he opined that Dishong's ability to understand, remember, and carry out instructions was not affected by her impairment; and that her ability to interact appropriately with supervision, coworkers, and the public, as well as respond to changes in the routine work setting, *was* affected by her impairments. T491-492. But he did not complete the section of the form assessing the severity of her limitations. T492.

HEARING TESTIMONY

Dishong testified at the administrative hearing regarding the day-to-day impairments resulting from her condition and the medications she takes to control it. Dishong said that she struggles with even simple tasks at home, tending to go from one thing to the next without remembering what she was doing before. T53. She attributed much of her inability to concentrate on the side effects of her medications, and said that Dr. Egger had described her as "medication-resistant." T53. Because of that, she said, she had hypomanic episodes three to four, or up to six, times a year. T53.

With respect to her daily routine, Dishong testified that in the morning, she got her daughter up and to school, and tried "to get out of the house and not be there alone all the time." T55. She visited her mother, and ran errands, "generally in the morning, because the grocery store is not busy." T55. She did drive her own car and do her own housework. T56.

Dishong explained that she had dropped out of community college classes because she was failing. T56. But, she said, her plan was to continue therapy and try to get to where she was stable enough to go and work. T57. She explained that she had left her last employment because the projects she was assigned caused her to decompensate, which she described:

> I would lose all track of time, concentration, be unable to function just as a person, as anyone else would. Those are the times when you quit showering, you stop eating. You're irresponsible. Those are the times I had to call my family in to take care of my daughter. You decompensate to the point where you just are not there. And going through a medication change is incredibly difficult. It is for me anyway. I don't know how it is for others, but for me, it's very difficult to go through.

T58. Her hypomanic episodes, she said, start out as depression, and then she becomes "agitated, irritated, very difficult to be around . . . ." T58. And, she said, in her hypomanic state she becomes "irresponsible, an irresponsible person." T59. During the depressive phase of an episode, all she wants to do is sleep. T59. She said she relied on her mother and sister for support, explaining that her sister paid her rent and that she took care of her daughter, but

> there is a lot of time that my mother and my sister have picked up the pieces, you know, and taken her to their house and, you know, watched her for a few days while I got myself in order, you know, because she doesn't need to be there with me watching me sleep all day and not shower and not eat. It's not good for her.

T63. Dishong testified that at a job, even if she wasn't around as many people, the problem was that she still didn't "have the concentration and the ability to organize, to keep things moving in the right direction." T61.

The vocational expert (VE) who testified at the hearing was presented with a hypothetical assuming a claimant who had no physical impairment and was generally healthy, and could handle unskilled work with no more than occasional social interaction. T68. Such limitations, the VE opined, would permit the claimant to return to Dishong's previous work as a document preparer, and would permit work in other unskilled jobs. T68-69. When asked by Dishong's counsel about a claimant who would be precluded from 15 percent of an 8-hour work day of completing a normal work day or work week without interruptions from psychologically-based symptoms, and who could perform at a consistent pace without an unreasonable number and length of rest periods, the VE thought that such a person would still be able to maintain employment. T69-70. But when the claimant was unable for 15 percent of the work day to perform activities within a schedule, maintain regular attendance, be punctual within customary tolerances, sustain an ordinary routine without special supervision, or work in coordination with or in proximity to others without being distracted by them—then, the VE said, such an individual would not be able to maintain employment. T70. And, the VE said, an individual who was absent from work 5 days a month could not sustain employment. T71.

## SEQUENTIAL ANALYSIS AND ALJ FINDINGS

To determine whether a claimant is entitled to disability benefits, the ALJ performs a five-step sequential analysis. 20 C.F.R. § 404.1520(a)(4).

At the first step, the claimant has the burden to establish that she has not engaged in substantial gainful activity since her alleged disability onset date. *Gonzales v. Barnhart*, 465 F.3d 890, 894 (8th Cir. 2006); 20 C.F.R. § 404.1520(a)(4)(i). If the claimant has engaged in substantial gainful activity, the claimant will be found not to be disabled; otherwise, the analysis proceeds to step two. *Gonzales*, 465 F.3d at 894; 20 C.F.R. § 404.1520(a)(4)(i).

In this case, the ALJ found that Dishong had not engaged in substantial gainful activity since her alleged disability onset date, and that finding is not disputed on appeal. T13.

## STEPS TWO AND THREE

At the second step, the claimant has the burden to prove she has a "medically determinable physical or mental impairment" or combination of impairments that is "severe[,]" 20 C.F.R. § 404.1520(a)(4)(ii), in that it "significantly limits [her] physical or mental ability to perform basic work activities." *Gonzales*, 465 F.3d at 894; *see also Kirby v. Astrue*, 500 F.3d 705, 707-08 (8th Cir. 2007). Next, "at the third step, [if] the claimant shows that [her] impairment meets or equals a presumptively disabling impairment listed in the regulations, the analysis stops and the claimant is automatically found disabled and is entitled to benefits." *Gonzales*, 465 F.3d at 894; 20 C.F.R. § 404.1520(a)(4)(iii). Otherwise, the analysis proceeds.

For mental impairments, at steps two and three of the sequential analysis, the ALJ utilizes a two-part "special technique" to evaluate a claimant's impairments and determine, at step two, whether they are severe, and if so, at step three, whether they meet or are equivalent to a "listed mental disorder." 20 C.F.R. § 404.1520a(a), (d)(1) and (2). The ALJ must first determine whether the claimant has "medically determinable mental

impairment(s)." 20 C.F.R. § 404.1520a(b)(1). If any such impairment exists, the ALJ must then rate the degree of "functional limitation" resulting from the impairment. 20 C.F.R. § 404.1520a(b)(2). This assessment is a "complex and highly individualized process that requires [the ALJ] to consider multiple issues and all relevant evidence to obtain a longitudinal picture of [the claimant's] overall degree of functional limitation." 20 C.F.R. § 404.1520a(c)(1).

Four "broad functional areas" are used to rate these limitations: "[a]ctivities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation." 20 C.F.R. § 404.1520a(c)(3). These areas are also referred to as the "paragraph B criteria," which are contained in 20 C.F.R. Part 404, Subpart P, Appx. 1, § 12.00 et seq. The first three criteria are rated using a five-point scale of none, mild, moderate, marked, and extreme. 20 C.F.R. § 404.1520a(c)(4). The fourth criterion, episodes of decompensation, is rated as: none, one or two, three, four or more. Id.

After rating the degree of functional limitation resulting from any impairments, the ALJ determines the severity of those impairments (step two). 20 C.F.R. § 404.1520a(d). Generally, if the first three functional areas are rated as "none" or "mild" and the fourth area as "none," the ALJ will conclude that any impairments are not severe, unless the evidence indicates otherwise. 20 C.F.R. § 404.1520a(d)(1). If any impairments are found to be severe at step two, the ALJ proceeds to step three, and compares the medical findings about the impairments and the functional limitation ratings with the criteria listed for each type of mental disorder in 20 C.F.R. Part 404, Subpart P, Appx. 1, § 12.00 et seq.

The ALJ found that Dishong had severe impairments: bipolar disorder, anxiety, and borderline personality disorder. T14. But, the ALJ found,

Dishong's impairments did not meet the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appx. 1, § 12.00 *et seq.* T14.

RESIDUAL FUNCTIONAL CAPACITY

Before moving to step four, the ALJ must determine the claimant's residual functional capacity (RFC), which is then used at steps four and five. 20 C.F.R. § 404.1520(a)(4). "'Residual functional capacity' is defined as 'the most [a claimant] can still do' despite the 'physical and mental limitations that affect what [the claimant] can do in a work setting' and is assessed based on all 'medically determinable impairments,' including those not found to be 'severe.'" *Gonzales*, 465 F.3d at 894 n.3 (quoting 20 C.F.R. §§ 404.1545 and 416.945).

To determine a claimant's RFC, the ALJ must consider the impact of all the claimant's medically determinable impairments, even those previously found to not be severe, and their related symptoms, including pain. 20 C.F.R. §§ 404.1529(d)(4) and 404.1545(a)(1) and (2). This requires a review of "all the relevant evidence" in the case record. 20 C.F.R. § 404.1545(a). Although the ALJ is responsible for developing the claimant's complete medical history, 20 C.F.R. § 404.1545(a)(3), the claimant bears the burden of proof to demonstrate his or her RFC. *Young v. Apfel*, 221 F.3d 1065, 1069 n.5 (8th Cir. 2000). The ALJ will consider "statements about what [the claimant] can still do that have been provided by medical sources, whether or not they are based on formal medical examinations," as well as descriptions and observations of the claimant's limitations caused by her impairments, including limitations resulting from symptoms, provided by the claimant or other persons. 20 C.F.R. § 404.1545(a)(3).

The RFC assesses the claimant's ability to meet the physical, mental, sensory, and other requirements of work. 20 C.F.R. § 404.1545(a)(4). The

mental requirements of work include, among other things, the ability: to understand, remember, and carry out instructions; to respond appropriately to supervision, coworkers, and work pressures in a work setting; to use judgment in making work-related decisions; and to deal with changes in a routine work setting. 20 C.F.R. §§ 404.1545(c) and 404.1569a(c); SSR 96-8p, 61 Fed. Reg. 34474-01, 34477 (July 2, 1996). An RFC must assess the claimant's ability to meet the mental requirements of work, 20 C.F.R. § 404.1545(a)(4), which includes the ability to respond appropriately to coworkers and work pressures. 20 C.F.R. §§ 404.1545(c) and 404.1569a(c); SSR 96-8p, 61 Fed. Reg. at 34477. The RFC must include all limits on work-related activities resulting from a claimant's mental impairments. SSR 85-16, 1985 WL 56855, at *2 (1985).

A special procedure governs how the ALJ evaluates a claimant's symptoms. The ALJ first considers whether the claimant suffers from "medically determinable impairment(s) that could reasonably be expected to produce [the claimant's] symptoms." 20 C.F.R. § 404.1529(a) to (c)(1). A medically determinable impairment must be demonstrated by medical signs or laboratory evidence. 20 C.F.R. § 404.1529(b). If this step is satisfied, the ALJ then evaluates the intensity and persistence of the claimant's symptoms to determine how they limit the claimant's ability to work. 20 C.F.R. § 404.1529(c)(1). This again requires the ALJ to review all available evidence, including statements by the claimant, "objective medical evidence,"[2] and "other evidence."[3] 20 C.F.R. § 404.1529(c)(1) to (3).

---

[2] 20 C.F.R. §§ 404.1529(c)(2) and 404.1528(b) and (c).

[3] "Other evidence" includes information provided by the claimant, treating and non-treating sources, and other persons. *See* 20 C.F.R. § 404.1529(a)(1) (and sections referred to therein); *see also* 20 C.F.R. § 404.1529(c)(3).

The ALJ considers the claimant's statements about "the intensity, persistence, and limiting effects of [her] symptoms," and evaluates them "in relation to the objective medical evidence and other evidence." 20 C.F.R. § 404.1529(c)(4). Ultimately, symptoms will be determined to diminish the claimant's capacity for basic work activities, and thus impact the claimant's RFC, "to the extent that [the claimant's] alleged functional limitations and restrictions due to symptoms . . . can reasonably be accepted as consistent with the objective medical evidence and other evidence." *Id.*; 20 C.F.R. § 404.1529(d)(4). In assessing the credibility of a claimant's subjective testimony regarding his or her alleged symptoms, the ALJ must weigh a number of factors. *See, Moore v. Astrue*, 572 F.3d 520, 524 (8th Cir. 2009); 20 C.F.R. § 404.1529(c)(3)(i–vii). When deciding how much weight to afford the opinions of treating sources and other medical opinions regarding a claimant's impairments or symptoms, the ALJ considers a number of factors set forth in 20 C.F.R. § 404.1527.

The ALJ found that Dishong had the RFC to

> perform a full range of work at all exertional levels but with the following nonexertional limitations: She could perform routine, repetitive unskilled work . . . where [she] should not need to have extended concentration or set goals and social interaction could be occasional, but avoid constant, intense, and frequent with co-workers, supervisors, and the general public.

T15. The ALJ found that Dishong's statements concerning the limitations of her symptoms were not entirely credible. T17. And, the ALJ found that Dr. Egger's opinion and Balcetis' opinion were inconsistent with the record. T18, 23. Instead, the ALJ credited Dr. Petrides' opinion, the opinions of the state

agency consultants, and Alexis Rickert, a "short term disability benefit specialist,"[4] with respect to Dishong's mental condition. T19, 26; *see* T471.

The ALJ explained that she had "carefully considered" Balcetis' opinion regarding Dishong's limitations, but said that "there are no treatment records" to substantiate his opinion, and that the medical records "indicate that the claimant's mood had stabilized and improved and was consistent with the residual functional capacity determined in this decision." T23. Likewise, the ALJ said she had "carefully considered" Dr. Egger's opinion, but that "there are no treatment records" to substantiate his opinion, and that the medical records were consistent with the RFC found by the ALJ. T24. Dr. Petrides and Rickert were, the ALJ explained, "examining sources" whose opinions were entitled to weight. T26.

### STEPS FOUR AND FIVE

At step four, the claimant has the burden to prove that she lacks the RFC to perform her past relevant work. *Gonzales*, 465 F.3d at 894; 20 C.F.R. § 404.1520(a)(4)(iv). If the claimant can still do her past relevant work, she will be found to be not disabled, otherwise, the analysis proceeds to step five. At step five, the burden shifts to the Commissioner to prove, considering the claimant's RFC, age, education, and work experience, that there are other jobs in the national economy that the claimant can perform. *Gonzales*, 465 F.3d at 894; 20 C.F.R. § 404.1520(a)(4)(v).

The ALJ found that Dishong could perform her past relevant work. T26. Alternatively, the ALJ found that Dishong could also perform other

---

[4] The scope of Rickert's actual evaluation of Dishong is wholly unclear. That will be discussed in more detail below.

work that exists in significant numbers in the national economy. T27. So, the ALJ found that Dishong was not disabled. T28. Dishong appeals.

## STANDARD OF REVIEW

The Court reviews a denial of benefits by the Commissioner to determine whether the denial is supported by substantial evidence on the record as a whole. *Teague v. Astrue*, 638 F.3d 611, 614 (8th Cir. 2011) (citing 42 U.S.C. § 405(g)). Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the conclusion. *Id*. The Court must consider evidence that both supports and detracts from the ALJ's decision, and will not reverse an administrative decision simply because some evidence may support the opposite conclusion. *Perkins v. Astrue*, 648 F.3d 892, 897 (8th Cir. 2011). If, after reviewing the record, the Court finds it is possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings, the Court must affirm the ALJ's decision. *Id*.

## DISCUSSION

Dishong's primary argument is that the ALJ erred in not crediting the opinions of her treating providers, which support a finding of disability. As a result, Dishong argues, the ALJ's RFC findings were flawed and the hypothetical posed to the VE was inaccurate. Instead, Dishong argues, the ALJ should have credited the opinions proffered by her treating health care providers—in particular, affording controlling weight to Dr. Egger's opinion—and concluded that Dishong is disabled. The Court agrees.

The opinion of a treating medical source is given more weight because those sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of the claimant's impairments and may bring a

unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations. 20 C.F.R. § 404.1527(c)(2). When the treating physician's opinion is supported by proper medical testing, and is not inconsistent with other substantial evidence in the record, the ALJ must give the opinion controlling weight. *See, id.*; *Anderson v. Astrue*, 696 F.3d 790, 793 (8th Cir. 2012).

Even if the treating source's opinion is not given controlling weight, an ALJ must apply certain factors—the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and the specialization of the treating source—in determining what weight to give the opinion. *See* 20 C.F.R. 404.1527(c)(2); *see also* *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004). And the ALJ must *always* give good reasons for the weight given the treating source's opinion. 20 C.F.R. § 404.1527(c)(2); *see also* *Anderson*, 696 F.3d at 793. Pursuant to that provision, a decision denying benefits "must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." SSR 96-2p, 61 Fed. Reg. 34490-01, 34492 (July 2, 1996); *Wilson*, 378 F.3d at 544.

There is no dispute that Dr. Egger was a treating source whose opinion was entitled to deference. *See* 20 C.F.R. § 404.1502. The ALJ stated only that Dr. Egger's opinion was given "less weight" because, according to the ALJ, there were no treatment records "from Dr. Egger" to substantiate his opinion, and the medical records were actually consistent with the ALJ's RFC

determination. But the ALJ identified nothing particular *in* Dr. Egger's treatment notes that is inconsistent with his opinion. The Court recognizes that it reviews for substance over form: an arguable deficiency in opinion-writing technique does not require the Court to set aside an administrative finding when that deficiency had no bearing on the outcome. *Buckner v. Astrue*, 646 F.3d 549, 559 (8th Cir. 2011). And the Court also recognizes that it is permissible for an ALJ to discount an opinion of a treating source that is inconsistent with the source's clinical treatment notes. *Davidson v. Astrue*, 578 F.3d 838, 843 (8th Cir. 2009). But the Court does not view its standard of review as requiring it to go blindly hunting through a claimant's medical records looking for inconsistencies upon which the ALJ *might* have relied.

Nor does the ALJ's recitation of Dishong's medical history seem to fairly characterize the available records, because the ALJ routinely omitted mention of Dishong's manic, hypomanic, or depressive episodes. The ALJ's summary of the medical history starts in 2005 with Dishong's initial evaluation by Balcetis, then skips ahead to May 2011, when Dishong had stabilized and improved. T17-18. The ALJ noted several of Crane's opinions supporting Dishong's short-term disability claims, but found that "there are no treatment records from Ms. Crane" to substantiate her opinion. T18. The ALJ, however, did not address the progress notes from Crane during the same period, and which describe a manic or hypomanic episode in August and September 2011. *See* T315, 317, 319. That episode is also reflected in Balcetis' records—but the ALJ's recitation of the record skips from Dishong's sessions with Balcetis in May to her sessions in November, when she was doing better. *Compare* T17-18 *with* T301-320. In other words, the ALJ simply left out Dishong's regression in August and September.

And that pattern continues. The ALJ noted that Dishong saw Balcetis on January 18, 2012, and then skips to Dishong's session with Balcetis on March 14. T18-19. This omits the "rocky progress" noted by Balcetis on January 30, the regression noted by Balcetis on February 20, and Crane's observation of a hypomanic mood on March 9. T286, 288, 291. The ALJ proceeds to discuss Dishong's sessions with Balcetis on April 3 and Crane on April 6, then jumps ahead to her sessions with Balcetis on May 1 and May 15. T19-20. The ALJ noted Balcetis' observation that Dishong's mood had stabilized and improved, but did not note Balcetis' opinion that the improvement was because Dishong was no longer working. T20. The ALJ recited Dishong's sessions with Balcetis and Crane during May and June in some detail, then her sessions with Balcetis in September and November, when Balcetis felt Dishong was showing improvement. T21.

But the ALJ skipped from Dishong's sessions with Balcetis and Dr. Egger in December 2012 to her session with Balcetis on February 5, 2013— leaving out any mention of the regression noted on January 29. T21-22, 288. The ALJ discussed Dishong's sessions with Balcetis in April and May, but then jumped to June 28, leaving out the hypomanic episode and regression noted on June 6. T22, 420. From there, the ALJ skips ahead to August 15, when Balcetis noted improvement—but that omitted the consistent regression noted on July 25, July 29, and August 8. T22, 412-414. The ALJ next noted Balcetis' session with Dishong on November 21, when Balcetis saw improvement—skipping past the depressive episode that caused regression Balcetis noted on October 17 and November 7. T22, 424-425.

In other words, Dishong's medical history shows a pattern consistent with a diagnosis of bipolar disorder—a cycle of improvement and regression— but the ALJ's description of that history omits any mention of any of the

records noting regression. It is difficult to credit the ALJ's decision to set aside the opinion of a treating medical source as not supported by the treatment records when (1) the ALJ did not identify any inconsistency, and (2) the ALJ's conclusion that the treatment records support her RFC appears to have been based on an unrepresentative selection of the evidence.

Nor does the ALJ's discussion of Dishong's day-to-day activities square with the record. It is true, as the ALJ noted, that Dishong testified to a number of daily activities such as getting her daughter to school, shopping for groceries, doing housework, and visiting family and seeing her therapist. T25. But Dishong also testified that she has difficulty completing some of those tasks because of her medications, and that her condition sometimes precludes them entirely. And Dishong's testimony that her mother and sister took care of her daughter for days at a time during Dishong's depressive states wasn't addressed in any way by the ALJ. Simply put, Dishong's actual evidence and testimony does not support the ALJ's incomplete characterization of it. *See Leckenby v. Astrue*, 487 F.3d 626, 634 (8th Cir. 2007). The Court would find it easier to defer to the ALJ's findings of fact if her decision suggested that the facts had been fully evaluated. But an incomplete description of a claimant's activities is an unpersuasive basis for an ALJ's dismissal of a treating source's opinion. *See Tilley v. Astrue*, 580 F.3d 675, 681 (8th Cir. 2009). The ALJ's recitation of the facts in this case is precisely the sort of "truncated discussion" that the Eighth Circuit has found insufficient to support an ALJ's finding that a claimant's activities are inconsistent with a claim of disability. *See Reed*, 399 F.3d at 922-23.

But more importantly, the Court finds nothing in Dishong's testimony that is inconsistent with the opinions of Dishong's treating medical providers regarding her limitations and ability to work. *See Leckenby*, 487 F.3d at 634.

Dishong's ability to engage in some life activities, despite her bipolar disorder, "does not mean she retained the ability to work as of the date last insured." *See Tilley*, 580 F.3d at 681. The Eighth Circuit has, in fact, "oft-expressed skepticism about the probative value of evidence of day-to-day activities," and has found it "necessary from time to time" to remind the Commissioner "'that to find a claimant has the residual functional capacity to perform a certain type of work, the claimant must have the ability to perform the requisite acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world.'" *Reed*, 399 F.3d at 923-24. The Eighth Circuit has "'repeatedly observed that "the ability to do activities such as light housework and visiting with friends provides little or no support for the finding that a claimant can perform full-time competitive work."'" *Id.* at 923.

Simply put, this is not a case where the claimant's credibility is undermined by activity that is inconsistent with her claimed limitations. *E.g. Travis v. Astrue*, 477 F.3d 1037, 1042 (8th Cir. 2007). In point of fact, Dishong's self-reported activities are wholly consistent with the nature of her claimed limitations. Dishong's ability to function some of the time does not contradict the evidence of her inability to function during manic, hypomanic, or depressive episodes. And Dishong also said that even her routine day-to-day tasks suffered from time to time, which is consistent with the opinions of her doctor and therapist that she could be expected to miss work several times a month due to her limitations.

Other aspects of the ALJ's decision are also troublesome. The ALJ gave "substantial weight" to the state agency consultants, and "great weight" to Dr. Petrides, Balcetis, and Rickert. The ALJ's decision to afford "substantial weight" to the state agency consultants is, the Court supposes, fair enough—

although, the Court notes, the opinions of non-treating practitioners who have attempted to evaluate the claimant without examination do not normally constitute substantial evidence on the record as a whole upon which to base a denial of benefits. *Shontos v. Barnhart*, 328 F.3d 418, 417 (8th Cir. 2003). But the ALJ's decision to give "great weight" to Dr. Petrides' opinion is perplexing. The ALJ described Dr. Petrides as "an acceptable medical source and treating or examining source." T26. True, Dr. Petrides met with Dishong. T487. But it appears from the record—and the Commissioner appears to concede—that Dr. Petrides did not review Dishong's medical records.[5] *See* filing 14 at 15. This is particularly troubling given the episodic nature of bipolar disorder, diagnosis of which depends on consideration of the patient's history. *See* DSM-5 at 131-32. The Eighth Circuit has held that it is appropriate to discredit the opinion of a medical source who did not review *some* of the claimant's medical records. *See*, *McCoy v. Astrue*, 648 F.3d 605, 616 (8th Cir. 2011); *Wildman v. Astrue*, 596 F.3d 959, 967-68 (8th Cir. 2010). Dr. Petrides reviewed none of them.

As a result, Dr. Petrides' actual diagnosis for Dishong's condition was an "unspecified anxiety disorder" and "unspecified depressive disorder, mild"—diagnoses that are at odds with all the other evidence in the record, and that are contrary even to the ALJ's findings regarding Dishong's impairments. T490. It is hard to see any justification for giving "great weight"

---

[5] The parties dispute whether Social Security Administration rules required those records to be provided. *Compare* filing 14 at 15-16 *with* filing 15 at 8-10. The Court is not convinced it matters: in this instance, given Dishong's diagnosis, Dr. Petrides' failure to review the records chronicling the course of her disease fatally undermines his credibility, regardless of whether or not Social Security Administrative guidelines were followed.

to Dr. Petrides' opinion about Dishong's limitations while at the same time disregarding the diagnosis upon which those limitations were founded.[6]

And what is further perplexing is the ALJ's decision to afford "great weight" to the opinion of "Alexis Rickert, Short Term Disability Benefit Specialist," who the ALJ characterized as an "examining source." There is no evidence in the record that Rickert examined Dishong. There is nothing in the record to establish what, if any, credentials Rickert may have had to opine on Dishong's limitations. In fact, the only inference from the record the Court can draw is that Rickert is, literally, an employee of Dishong's disability insurance company.

Rickert appears in the record once, as the signatory to a March 8, 2012 letter to Dishong from Lincoln Financial Group, explaining to Dishong that her claim for short-term disability benefits had been denied. T471. Rickert signed the letter, "Alexis Rickert for Michael Mueller, Short Term Disability Specialist, Lincoln National Life Insurance Company." T471. Mueller's name appears several times in the record; he was a short-term benefit specialist for Lincoln Financial Group, and signed several letters to Dishong approving, extending, or requesting more information relating to Dishong's short-term

---

[6] Nor is it even clear what Dr. Petrides concluded with respect to Dishong's limitations. On the Social Security Administration's Form HA-1152 (Medical Source Statement of Ability to Do Work-Related Activities (Mental)), Dr. Petrides selected "Yes" in response to the question, "Is ability to interact appropriately with supervision, co-workers, and the public, as well as respond to changes in the routine work setting, affected by impairments?" T492. But Dr. Petrides did not complete the following section of the form identifying any restrictions. T492. It is possible that Dr. Petrides did not understand the form. But the omission means that despite the ALJ giving "great weight" to Dr. Petrides' opinion, the form Dr. Petrides completed does not clearly support the ALJ's conclusions regarding Dishong's limitations.

disability claims. T472, 476, 480, 495. In other words, he was an insurance claims adjuster. Rickert *might* have been an adjuster herself, but the way in which she signed the letter that she sent—"Alexis Rickert for Michael Mueller"—leaves that fact indeterminable. T471. There is no conceivable justification for giving "great weight" to her "opinion."

There is yet another complicating factor: Balcetis' treatment notes—and his opinion, as the health care provider who was clearly most familiar with Dishong's case—are obviously very significant, but it is not clear what weight the ALJ gave to them. At one point in her decision, the ALJ wrote that she had carefully considered Balcetis' records and his January 17, 2014 opinion that Dishong was disabled, but that

> there are no treatment records from Mr. Balcetis to substantiate this opinion, and in fact, medical records from Mr. Balcetis indicate that the claimant's mood had stabilized and improved and was consistent with the residual functional capacity determined in this decision. Therefore, Mr. Balcetis' statement dated January 17, 2014, is afforded less weight because the record as a whole supports the above residual functional capacity assessment.

T23. Later, however, the ALJ wrote that she had given "great weight" to Balcetis' opinion and treatment records, because he was an examining source whose "opinions or treatment records are entitled to weight[.]" T26. "These assessments and conclusions are based on clinical findings," the ALJ wrote, "are consistent with each other, and are consistent with other substantial medical evidence of record." T26.

It is not clear how to reconcile those statements. The Commissioner dismisses the later attribution of "great weight" as a "typographical error." Filing 14 at 14 n.4. It is not that simple. The Court recognizes that an arguable deficiency in opinion writing that has no practical effect on an ALJ's decision is not a sufficient reason to set that decision aside. *See Welsh v. Colvin*, 765 F.3d 926, 929 (8th Cir. 2014). But it is not easy to find there was no "practical effect" on the decision when the decision is ambiguous as to the weight afforded the records and opinion of the claimant's principal health care provider. It is even harder to meaningfully review an ALJ's decision when the basis for the decision isn't clear to the parties or the Court.

"It is well-established that an agency's action must be upheld, if at all, on the basis articulated by the agency itself." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 50 (1983). The Court may not accept appellate counsel's *post hoc* rationalization for administrative agency action. *Id.* It would not be meaningfully different to accept appellate counsel's articulation of a basis for agency action that was not clearly articulated by the agency in the first place.

One final puzzle in the ALJ's decision is a paragraph in which the ALJ explained:

> There are no opinions from treating or examining physicians that indicate the claimant is disabled or has significant functional limitations greater than those reflected above. Nor are there recommendations that he limit his activities or seek further treatment. The objective findings also fail to show the claimant's symptoms are as limiting as he has alleged. His prescribed medications provide adequate, if not total relief, when taken as directed.

¶26. But, of course, there *is* a treating physician's opinion that Dishong is disabled, and that she seek further treatment, and no reasonable dispute that her medications do not control her condition—and, obviously, Dishong is a woman. The most charitable conclusion the Court can reach is that this paragraph came from another case entirely, and was accidentally pasted into the wrong decision. As with Dr. Petrides, Rickert, and Balcetis, it is obvious that the ALJ made some sort of error—but whether that error was simply in the drafting, or in the actual decision-making, is not something the Court can readily determine. And at some point, those mistakes reach critical mass. When there are significant deficiencies in the ALJ's reliance on each and every one of the sources she identified as being given "great weight," then we have passed that point.

The remaining question is whether the Court should remand this case to the Social Security Administration for clarification, or whether the record establishes Dishong's entitlement to benefits. The Court concludes that Dishong is entitled to benefits, because there is not substantial evidence in the record supporting the ALJ's decision not to afford controlling weight to Dr. Egger's opinion.

The Court is aware that an ALJ may discount or even disregard the opinion of a treating source where other medical assessments are supported by better or more thorough medical evidence, or where a treating source renders inconsistent opinions that undermine the credibility of such opinions. *Reed*, 399 F.3d at 921; *see Fentress v. Berryhill*, No. 16-1933, 2017 WL 1450473, at *2 (8th Cir. Apr. 25, 2017). But the ALJ must give "controlling weight" to a treating physician's opinion if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence. *Papesh v. Colvin*, 786 F.3d

1126, 1132 (8th Cir. 2015). And "not inconsistent" means that a well-supported treating source medical opinion need not be supported directly by all of the other evidence—that is, it does not have to be consistent with all the other evidence—as long as there is no other substantial evidence in the case record that contradicts or conflicts with the opinion. *See id.*

The ALJ did not identify any substantial evidence that contradicted or conflicted with Dr. Egger's opinion, and the Court could not find any. The closest that can be found are the several instances on which it was noted that Dishong was improving or stable—but, given an established diagnosis of severe bipolar I disorder, evidence that Dishong does better at some times than others hardly "contradicts or conflicts" Dr. Egger's opinion. And even if a treating physician's opinion is not entitled to controlling weight, it should not ordinarily be disregarded and is entitled to substantial weight. *Id.* The ALJ did not afford substantial weight to Dr. Egger's opinion, and the ALJ offered no basis to give the opinion non-substantial weight. *See id.*

Nor is there substantial evidence supporting the ALJ's decision to discount Balcetis' opinion. (Assuming, for the moment, that's what the ALJ actually did.) Balcetis' opinion was not entitled to controlling weight, because he was not an "acceptable" medical source—that is, he was not a licensed physician or psychologist. *See* 20 C.F.R. § 404.1502(a). But he was still a "medical source" who was an appropriate source of evidence regarding the severity of Dishong's impairment, and the effect of the impairment on her ability to work. *Shontos*, 328 F.3d at 426 (citing 20 C.F.R. § 404.1513(d)(1)).[7]

_____

[7] The Court is aware that several relevant regulations were amended effective March 27, 2017. *See* Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 5844-01 (Jan. 18, 2017). Those changes, as relevant, apply to claims filed on or after March

The amount of weight given to a medical opinion is to be governed by a number of factors including the examining relationship, the treatment relationship, consistency, specialization, and other factors. Generally, more weight is given to opinions of sources who have treated a claimant, and to those who are treating sources. 20 C.F.R. § 404.1527(d). The regulations provide that the longer and more frequent the contact between the treating source, the greater the weight will be given the opinion: "When the treating source has seen you a number of times and long enough to have obtained a longitudinal picture of your impairment, we will give the source's opinion more weight than we would give it if it were from a nontreating source." *Id.* at (d)(2)(i).

*Shontos*, 328 F.3d at 426. And even where controlling weight is not given to a treating source's opinion, it is weighed according to those factors. *Id.*

Here, Balcetis saw Dishong 75 times over the course of 24 months, "which is more than adequate to provide a longitudinal picture of [her] impairment." *Id.* Alegent Health Psychiatric Associates provided a "team approach to mental health care," *see id.,* and Dishong was treated by Balcetis and Crane, then Balcetis and Dr. Egger. The opinions of Crane, Balcetis and Egger "reflected clinical judgments of professionals who had interacted with and observed [Dishong] over time. Their opinions and evaluations were based on a longitudinal perspective of [Dishong]. The opinions of these three

27, 2017, *see* 20 C.F.R. § 404.1527 (2017), and the Court generally cites to the versions of these regulations in effect at the time Dishong's claim was adjudicated.

treating mental health care providers were consistent." *Id.* Accordingly, the ALJ's failure to afford controlling or great weight to those opinions was "not borne out by the record." *Id.* The ALJ should have afforded great weight to Balcetis' opinion of January 17, 2014, and controlling weight to Dr. Egger's opinion of January 30.

Having reached that conclusion, it is unnecessary for the Court to discuss Dishong's other arguments. Dr. Egger's opinion, when given controlling weight, establishes the required level of severity under the criteria contained in 20 C.F.R. Part 404, Subpart P, Appx. 1, §§ 12.04A and 12.06C.[8] Thus, Dishong's impairment meets or equals a presumptively disabling impairment, so the analysis stops at step three of the five-step sequential analysis, and Dishong is entitled to benefits. *See*, *Gonzales*, 465 F.3d at 894; 20 C.F.R. § 404.1520(a)(4)(iii). In the alternative, the evidence is uncontested that given an RFC based on Dr. Egger's opinion of Dishong's limitations, particularly the days of work she would be expected to miss, there is not a significant number of jobs in the national economy that Dishong can perform. *See*, *Gonzales*, 465 F.3d at 894; 20 C.F.R. § 404.1520(a)(4)(v). So, even if the sequential analysis proceeds to step five, Dishong is still entitled to benefits. The Court will therefore reverse the Commissioner's decision and remand for an award of benefits. *See Shontos*, 328 F.3d at 427.

---

[8] It is likely that Dr. Egger's opinion satisfies the Paragraph 'B' criteria as well, based on his conclusions that Dishong had a "very limited ability to set shift & refocus on new data or direction" and "cannot sustain attention, concentration or pace[.]" *See* 20 C.F.R. Part 404, Subpart P, Appx. 1, § 12.04B.

CONCLUSION

The Court has reviewed the administrative record and finds that the ALJ erred in not affording controlling weight to Dr. Egger's opinion. The Court will reverse the Commissioner's decision and remand the case for an award of benefits.

IT IS ORDERED:

1.    The Clerk of the Court is directed to substitute Acting Commissioner of Social Security Nancy A. Berryhill as the defendant.

2.    The Commissioner's decision is reversed.

3.    This matter is remanded to the Commissioner pursuant to sentence four of 42 U.S.C. § 405(g) for calculation and award of benefits.

4.    A separate judgment will be entered.

Dated this 5th day of May, 2017.

BY THE COURT:

John M. Gerrard
United States District Judge